a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| **BRITTANY TYSON,** <br> Petitioner | **CIVIL DOCKET NO. 5:22-CV-01109** <br> **SEC P** |
| **VERSUS** | **JUDGE EDWARDS** |
| **CHRIS STINSON,** <br> Respondent | **MAGISTRATE JUDGE PEREZ-MONTES** |

## REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 filed by counsel on behalf of Petitioner Brittany Tyson ("Tyson"). Tyson is incarcerated at the Louisiana Transitional Center for Women in Tallulah, Louisiana. She challenges her manslaughter conviction in the Twenty-Sixth Judicial District Court, Webster Parish, Louisiana.

Because Tyson has met her burden under § 2254(d) and applicable case law, the Petition (ECF No. 1) should be GRANTED and the case remanded to the trial court for further proceedings.

## I.   Background

Tyson pleaded guilty to manslaughter for the "shaking death" of her four-month-old son. *State v. Tyson*, 53,724, p. 5 (La. App. 2 Cir. 6/23/21); 321 So.3d 1134. She was sentenced to 20 years of imprisonment. *Id.* The facts were summarized by the appellate court as follows:

Riley Tyson was born to Brittany Tyson ("Tyson") on February 28, 2013. Tyson was 19 years old at the time and a single mother. She had dropped out of school in the ninth grade. On June 16, 2013, Tyson sought medical care for Riley after he sustained second-degree burns to his right leg. The burns were caused when Tyson's 16-year-old sister placed a hair dryer near Riley to soothe him. An investigation by the Department of Children and Family Services ("DCFS") determined that Tyson had failed to provide adequate supervision. The matter was referred to social services. Tyson agreed not to allow her sister to babysit or care for Riley, and Tyson agreed not to use a blow dryer to soothe Riley. No action was requested from the District Attorney.

While the investigation was being conducted, the Webster Parish Sheriff's Office ("WPSO") interviewed Tyson and her sister on June 26, 2013, concerning the burning. Tyson was arrested and charged with second degree cruelty to a juvenile and felony contributing to the delinquency of a juvenile.

On July 19, 2013, Tyson found Riley cold and nonresponsive when she went to check on him in his playpen while staying at her friends' apartment in Sibley, Louisiana. WPSO detectives who responded to the call recognized Riley from the earlier investigation related to the hair dryer incident. Drug paraphernalia containing drug residue was found in the apartment.

Tyson was transported to the WPSO office for an interview by detectives. Tyson told the detectives that she retrieved Riley from the bedroom where he was sleeping earlier that evening because he was crying. She changed his diaper, fed him, gave him gas drops, and rocked him to sleep. After he fell asleep, she returned him to his playpen in the bedroom. Tyson insisted to the detectives that nothing happened as they expressed doubt about her explanation.

Later during the interview, Tyson said that Riley awakened but she was able to get him back to sleep. He woke again screaming shortly thereafter, so she walked around with him while bouncing him. She denied that she bounced Riley too hard. Tyson was then asked if she had shaken Riley that day, and she responded affirmatively. A detective left the interview room and returned with a stuffed animal. Tyson rocked the stuff animal to show how she had handled Riley. When Tyson was asked if she held Riley out with him facing her and said "Why do you cry?", she held the stuffed animal in that manner and asked, "Why do you cry like that?" A detective then told Tyson that when he examined Riley's eyes, the eyes had a "coffee grounds"

2

appearance which comes from being shaken. Tyson explained that she was rocking him but he kept screaming, so she picked him up and shook him. She denied that he stopped crying at that point or when she returned him to his playpen. However, she admitted that he did not cry as loud after she had shaken him. She nodded in the affirmative when asked if she thought she shook him too hard. Later asked to demonstrate how she had shaken Riley, Tyson held the stuffed animal to her face and shook it while saying, "You get on my nerves." She said Riley kept crying after she laid him down in his playpen before returning to the living room. She thought Riley's head rocked forward two to three times when she shook him. She told the detectives that Riley was whimpering after she had shaken him, and his eyes closed. She returned him to his playpen and did not check on him until she discovered him deceased. Tyson was arrested and charged with first degree murder, possession of a Schedule I CDS, and possession of drug paraphernalia.

**Autopsy**

On July 20, 2013, Dr. Frank Peretti performed an autopsy on Riley, who was embalmed following the autopsy. After Dr. Peretti was told by investigators that Riley was shaken prior to being put back in his crib, he performed a posterior neck dissection. The posterior neck dissection revealed acute hemorrhage grossly and microscopically involving the cervical spine at C1. It is unclear from the autopsy report whether other autopsy findings were made during the original autopsy or the posterior neck dissection. Dr. Peretti's findings were healing burns and neck injuries consisting of "[i]njuries involving ligaments of cervical spine at C1" and "[c]erebral edema, mild." Neck injuries were listed as the cause of death.

In the external description section of the autopsy report, Dr. Peretti noted that "[t]the neck was symmetrical, without injury or abnormality." In the subsection for evidence of recent injury, Dr. Peretti wrote:

> There was no external evidence of injury noted to the head, neck, chest or abdomen. Posterior neck dissection showed hemorrhage surrounding the posterior atlanto-occipital membrane. There was a slight amount of surrounding soft tissue hemorrhage present. The cervical spine at C1 was removed en bloc and was decalcified. The brain grossly showed mild edema.

In the neck subsection of the internal examination section of the autopsy report, Dr. Peretti noted that examination of the soft tissues of the neck revealed no abnormalities or hemorrhage. Dr. Peretti wrote in the central nervous system subsection that there was no epidural, subdural, or subarachnoid hemorrhage present. However, mild cerebral edema was present. Dr. Peretti noted in the musculoskeletal system section that the cervical, thoracic and lumbar spine showed no obvious old fractures or other abnormalities. Regarding the cervical spine at C1, Dr. Peretti wrote in the histology subsection:

> After decalcification, step sections were made. There is acute hemorrhage involving the ligaments and soft tissue. Hemosiderin deposits are noted. Iron stains are negative.

*Tyson*, 321 So.3d 1134, 1139–40, *writ denied*, 2021-01086 (La. 1/26/22); 331 So.3d 901.

M. Randal Fish was appointed to represent Tyson. Mr. Fish requested a sanity commission as "he was concerned that Tyson had a mental disability because she had left school in the ninth grade." *Id.* at 1145. Tyson told both evaluating doctors that she told officers she had not shaken her baby, but finally told officers she had "so they would stop" the interrogation. *Id.* at 1141. Tyson was found competent and pleaded guilty to manslaughter. *Id.* On February 14, 2013, Tyson was sentenced to 20 years of imprisonment.

In 2016, Tyson obtained post-conviction counsel, who filed a post-conviction application on her behalf. Counsel received opinions from three forensic pathologists, all of whom disagreed with Dr. Peretti's findings. However, the application was denied as untimely. The Louisiana Supreme Court reversed, citing La. C.Cr.P. art. 930.8, which provides, in relevant part, for an exception to the statute of limitations where: "[t]he application alleges, and the petitioner proves . . .

4

that the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys"; and that the petitioner "exercised diligence in attempting to discover any post conviction claims that may exist." La. C.Cr.P. art. 930.8. The Louisiana Supreme Court remanded for an evidentiary hearing and consideration of Tyson's claims of actual innocence and ineffective assistance of counsel. *State v. Tyson*, 2018-1475, p. 1 (La. 4/22/19); 267 So.3d 584 (per curiam).

The trial court conducted an evidentiary hearing on November 25, 2019. The trial court heard testimony from forensic pathologist Dr. Dragovic, Mr. Fish, and Tyson's mother. Introduced into evidence at the hearing were: (1) a DCFS report from the burning incident; (2) the competency findings of Drs. Seiden and Williams; (3) the autopsy report; (4) Riley's medical records; (5) Dr. Dragovic's letter to Tyson's counsel and his curriculum vitae ("CV"); (6) the report and supplemental report from the WPSO concerning the investigation into Riley's death; (7) forensic pathologist Dr. Bonnell's affidavit[1] CV; (8) forensic pathologist Dr. Plunkett's letter

---

[1] The state court summarized:

> Dr. Bonnell testified: (i) Dr. Peretti was not a board-certified forensic pathologist; (ii) the autopsy report did not describe any injuries which could be lethal; (iii) the hemorrhage described in the neck dissection had the same appearance as that caused by lividity; (iv) it was scientifically impossible for there to be no hemosiderin yet have positive iron stains in the same area as described in the autopsy; (v) what Dr. Peretti described as hemosiderin was actually formalin artifact from the embalming process; (vi) it is possible Riley died from smothering or overlaying while in the blanket but the investigation was insufficient to establish that to be any more than a remote possibility; (vii) Dr. Peretti would not have felt obligated to autopsy the neck area during the second examination if he had not been influenced by the coerced confession; (viii) Dr. Peretti was unfamiliar with the neck area since he did not autopsy that area as part of his routine autopsy technique; and (ix) had an adequate autopsy and investigation been performed, Riley's death would

to Tyson's attorney[2]; (9) handwritten statements from two of Tyson's friends[3]; (10) a transcript of Tyson's interview prepared by her counsel; (11) a news article from a local newspaper concerning Riley's death; and (12) DVDs of Tyson's interview by the WPSO detectives, as well as the detectives' interviews of three of her friends who were present in the apartment on the date of Riley's death. *State v. Tyson*, 53,724 (La. App. 2 Cir. 6/23/21, 13–14); 321 So.3d 1134, 1143–44, *writ denied*, 331 So.3d 901.

As summarized by the appellate court:

---

fit the criteria of having an undetermined cause of death, which is commonly defined as SIDS.

*Tyson*, 53,724 (La. App. 2 Cir. 6/23/21, 9–10); 321 So.3d 1134, 1142, *writ denied*, 2021-01086 (La. 1/26/22); 331 So.3d 901.

[2]Dr. Plunkett also "disagreed with Dr. Peretti's conclusion regarding the cause and manner of Riley's death." *Id.* In Dr. Plunkett's opinion, Riley "presented no evidence of mechanical or structural damage to his neck." *Id.*

Dr. Plunkett believed that the autopsy failed to meet the minimum forensic autopsy performance standards at the time it was conducted. Dr. Peretti did not describe the damage done during the embalming process, and he failed to sign and date the initial autopsy report. Dr. Plunkett questioned Dr. Peretti's finding of hemosiderin deposits but a negative iron stain during the microscopic examination of the cervical spine. He believed that what Dr. Peretti was describing was formalin pigment secondary to the embalming process and not hemosiderin.

*Id.* Dr. Plunkett opined that the cause of Riley's death was undetermined. "While he acknowledged that some forensic pathologists would use the terms SIDS to describe Riley's death, he does not use that term. Dr. Plunkett would not disagree with a pathologist who reached the conclusion that an unsafe sleeping environment caused or contributed to Riley's death. Dr. Plunkett believed there was no evidence that shaking caused or contributed to Riley's death." *Id.*

[3] Lauren Lewis wrote that she never saw Tyson be aggressive toward Riley. Megan Lewis wrote that she was with Tyson most of the day and never saw Tyson shake Riley or be aggressive toward him.

Dr. Dragovic testified as an expert in the field of forensic pathology. He noted that Dr. Peretti was not a board-certified forensic pathologist. Dr. Dragovic explained that embalming can interfere with some of the aspects of a medical investigation. However, performing the posterior neck dissection after Riley was embalmed was not a problem. The problem was that Riley's cervical spinal cord was found to be intact as well as there being no fracture at C1. Dr. Dragovic stated that in order to cause death, an injury at C1 would have to involve the cervical spinal cord being compromised by the movement of the bony structures. Dr. Dragovic found no indications that Riley suffered from any violent contact.

Dr. Dragovic testified that there was no scientific physical evidence that supported Tyson's statement that she held Riley out and his head rocked back and forth two to three times. There would have been evidence of brain trauma if it had occurred as described by Tyson. However, there was no evidence of brain herniation, bruising, or hemorrhage. Dr. Dragovic regarded the finding of mild cerebral swelling as meaningless. Moreover, nothing in the autopsy, slides, or photographs corroborated Dr. Peretti's finding of mild edema. In his opinion, there was no brain injury that contributed to Riley's death.

Dr. Dragovic explained that he did not see hemorrhage involving ligaments and soft tissue at C1 when he reviewed the slides and photographs from Dr. Peretti's examination. There was some settling of blood in the area from the body's position after death. When examining the cervical spine at C1, Dr. Peretti had noted hemosiderin deposits, but iron stains were negative. According to Dr. Dragovic, hemosiderin is a pigment from the blood cells that contains iron. Thus, a negative iron stain in the presence of hemosiderin would not make any sense. Moreover, the presence of hemosiderin indicates an older hemorrhage of at least three days.

Dr. Dragovic was dismissive of the claim made by a detective to Tyson that he could see signs that Riley had been shaken when he looked at Riley's eyes. While Dr. Dragovic acknowledged there is the potential for retinal hemorrhage when there is significant head trauma, this hemorrhage could not be seen without using an ophthalmologic instrument.

Dr. Dragovic did not find any scientific evidence substantiating Dr. Peretti's claim that Riley's death was caused by neck injuries. In his opinion, Riley's death was most likely caused by asphyxia resulting from sleeping in the playpen with a large blanket. Asphyxia in small

babies normally does not reveal signs of injury. Dr. Dragovic concluded that Riley was not the victim of intentional violence or child abuse.

*Id.* at 1144-45. Thus, based on the testimony and exhibits, Drs. Bonnell, Plunkett, and Dragovic all disagreed with Dr. Peretti's processes and findings.

Mr. Fish testified that that he never sought a second opinion on Dr. Peretti's conclusion regarding the cause of Riley's death. *Id.*; ECF No. 8-1 at 842-49. He added that since Tyson's guilty plea, he has represented other defendants in similar cases and as he has learned about them, he has developed better resources to litigate them. *Id.* He testified that, at this point, he would at least seek an initial review of the autopsy report in most cases, which is funded through the public defender's office. Critically, Mr. Fish testified that, in hindsight, he would likely have sought a second opinion by sending the autopsy materials for review by a doctor that he knows in San Antonio, Texas. *Tyson*, 321 So.3d at 1145–46; ECF No. 8-1 at 842-49.

Mr. Fish admitted that it would cause him concern if Dr. Peretti had rendered an opinion as to the cause of death after the autopsy, but then changed that opinion after speaking to law enforcement officers. ECF No. 8-1 at 853. It would also concern him if Dr. Peretti did not form any conclusions after the initial autopsy, but did so only after the detectives contacted him to inform him that Tyson had confessed to shaking her son. *Id.* at 852.

Mr. Fish did not recall noticing that Dr. Peretti had performed the neck dissection after speaking with the detectives from the WPSO, and only then

concluded that neck injuries were the cause of death. He readily acknowledged that it would have been a "red flag" had he noticed that at the time. *Id.* at 844.

Mr. Fish explained that he requested a sanity commission review because he was concerned that Tyson had a mental disability. She had left school in the ninth grade. *Id.* He reviewed the reports from Dr. Seiden and Dr. Williams before she pleaded guilty. He noticed that she maintained her innocence in both reports, but he did not specifically recall if Tyson maintained her innocence when he spoke to her—only that there were discussions about whether she meant to harm Riley. *Id.*

Mr. Fish did not believe that a motion to suppress would have been the proper means of challenging the voluntariness of Tyson's statement to investigators. He did, however, have some reservations about the questions asked and the methods used by the detectives. Ultimately, he regarded any issues surrounding her confession to center on "the weight that should be accorded" to the confession. *Id.* at 854.

Mr. Fish acknowledged that his advice to take the plea was largely premised upon Dr. Peretti's autopsy report and conclusion that Riley died from neck injuries. Mr. Fish testified that, in hindsight, "it would have been better" to have obtained a second opinion regarding the cause of death. ECF No. 8-1 at 852. However, he did not know if a second opinion would have appreciably changed his advice. But it "may have." *Id.* Nevertheless, he did not favor the idea of going to trial "with somebody's life on the line and depending on dueling experts," particularly when there was a confession. *Id.*

Tyson's mother testified that she met with Mr. Fish once in his office and once in court before sentencing.  She recalled that Mr. Fish told them it was in her daughter's best interest to plead guilty to negligent homicide, and that her sentence would be 5-10 years. She told Mr. Fish that local media was reporting that Riley had died from suffocation.  *Tyson*, 321 So.3d at 1146; ECF No. 8-1 at 861.

The trial court denied Tyson's post-conviction claim of actual innocence because she failed to prove that the expert opinion testimony of Dr. Dragovic was evidence of actual innocence so compelling that no reasonable juror could vote to convict.  The trial court also denied Tyson's post-conviction relief claim of ineffective assistance of counsel because she failed to prove that Mr. Fish did not provide representation satisfying the minimum standards required by the constitutions of Louisiana and the United States.  *Id.* at 1147; ECF No. 8-1 at 45.

The appellate court affirmed, finding that Tyson's application presents no "new, material, noncumulative, and conclusive evidence that completely undermines the State's entire case and is so compelling that no reasonable juror would have found her guilty." *Id.* at 1149.   The appellate court stated:

> Dr. Dragovic's testimony and the reports of Dr. Bonnell and Dr. Plunkett call into question the possible cause of Riley's death and attempt to undermine Dr. Peretti's autopsy findings.  Although this new evidence is troubling and raises doubt as to whether Tyson shook Riley, it does not rise to the level of conclusive evidence of Tyson's innocence.

*Id.* at 1149.

As to the ineffective assistance of counsel claim, the appellate court summarized:

Tyson argues that Fish was ineffective in failing to conduct an independent pretrial investigation and failing to seek a second opinion on cause of death. Fish's investigation of this case was limited to a four or five hour review of the discovery provided by the state. Despite the fact that funding was available, Fish did not seek a second opinion on the alleged cause of death or even talk to a pathology expert to review Dr. Peretti's autopsy findings. The findings in the autopsy report, including the fact that some findings were made after discussions with law enforcement, should have alerted Fish to the need for further investigation. Nevertheless, early in his representation, the State presented Fish with the offer for Tyson to plead guilty to a lesser offense without a recommended sentence. Fish also discussed the possible sentence with the trial judge. Under the circumstances, and considering the sentence Tyson faced if convicted, the representation by Fish, an experienced criminal defense lawyer, was not deficient in this matter. However, even if we assume that Fish's representation was deficient and fell below the objective standard of reasonableness, we cannot conclude that Tyson was prejudiced.

Regarding the prejudice prong of *Strickland*, Tyson correctly asserts that the trial court applied the wrong standard in denying her claim. The trial court found that Tyson failed to show that "acquittal was a certainty." The correct standard is whether there is a reasonable probability the outcome of the trial would have been different. However, because Tyson pled guilty, she is required to prove that but for counsel's erroneous advice, she would have elected to go to trial rather than plead guilty. On review, Tyson merely claims that there is a reasonable probability that the result of this case would have been different if Fish had adequately investigated and sought a second opinion on cause of death, and ultimately relies on the presumption of prejudice set forth in *United States v. Cronic, supra*. In order for the presumption to apply, Tyson must establish that Fish entirely failed to subject the prosecution's case to meaningful adversarial testing such that she was denied any meaningful assistance. Because Fish reviewed discovery, filed several motions, and negotiated and provided Tyson with advice regarding the guilty plea, Fish provided Tyson with some meaningful assistance and this case does not fall within the narrow spectrum of cases described in *Cronic, supra*. Therefore, because Tyson has failed to establish that she is entitled to receive the benefit of the *Cronic* presumption, she is required to establish actual prejudice.

*Id.* at 1153.

11

The Louisiana Supreme court denied writs, *per curiam*. Justice Weimer concurred in part and dissented in part with reasons. He opined: "Since the courts below considered her factual innocence claim, the Legislature passed 2021 La. Acts 104, which provides in new Code of Criminal Procedure art. 926.2 for a freestanding claim of factual innocence not based on DNA evidence that, while similar, is distinct from the previously controlling standard set forth in *State v. Conway*, 01-2808 (La. 4/12/02), 816 So.2d 290 and *State v. Pierre*, 13-0873 (La. 10/15/13), 125 So.3d 403." *State v. Tyson*, 2021-01086, p. 1 (La. 1/26/22); 331 So.3d 901, 902. Justice Weimer would have granted the writ application in part and remanded the matter for consideration under the newly-enacted provisions. *Id.* Justices Hughes and Griffin would both "grant and docket," with Griffin assigning the same reason as Justice Weimer. *Id.*

Tyson's Petition is timely because it was filed within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1). The State does not challenge the timeliness of the Petition. ECF No. 8. Only its merits remain to be decided.

This Court heard oral argument by counsel for the parties and then took the case under advisement. After extensive review and deliberation, the Court decides as follows.

II.    **Law and Analysis**

    A.    **There is no free-standing "actual innocence" claim in the United States Court of Appeals for the Fifth Circuit.**

Tyson first challenges the state courts' rejection of her actual innocence claim. Although the United States Supreme Court has not decided whether a truly persuasive actual innocence claim may establish a constitutional violation sufficient to state a claim for habeas relief, the Fifth Circuit "does not recognize freestanding claims of actual innocence on federal habeas review." *In re* Palacios, 58 F.4th 189, 190 (5th Cir. 2023) (citing *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009)). Instead, "a credible showing of actual innocence" merely allows a prisoner to overcome a procedural default so that his underlying constitutional claims may be considered on the merits. *See Floyd v. Vannoy*, 894 F.3d 143, 154 (5th Cir. 2018).

To their credit, counsel for Tyson acknowledges as much without contest from counsel for the Government. Therefore, Tyson is not entitled to relief on this basis.

### B.   Tyson received ineffective assistance of counsel, and the trial court's application of *Strickland* was unreasonable.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires a district court to defer to a state court's determination of the merits of a prisoner's habeas claims unless the state's decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). Where a state court correctly identifies the governing clearly established law, a state court decision may nevertheless be "an unreasonable application" of that law if it "applies [the law] unreasonably to the

13

facts of a particular prisoner's case." *Hughes v. Vannoy*, 7 F.4th 380, 386 (5th Cir. 2021) (citing *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000)).

"A merely incorrect state court decision is not sufficient to constitute an unreasonable application of federal law. . . ." *Virgil v. Dretke*, 446 F.3d 598, 604 (5th Cir. 2006). Instead, the state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Tyson presented claims to the state courts under both *Strickland v. Washington*, 466 U.S. 668 (1984) and *United States v. Cronic*, 466 U.S. 648 (1984). Under *Strickland*, an ineffective-assistance-of-counsel claim is governed by a two-part inquiry. A petitioner "must show: (1) 'that counsel's representation fell below an objective standard of reasonableness,' and (2) that the deficiency was 'prejudicial to the defense.'" *Anaya v. Lumpkin*, 976 F.3d 545, 550–51 (5th Cir. 2020) (quoting *Strickland*, 466 U.S. at 692). Because the *Strickland* "inquiry is highly deferential to counsel" and AEDPA defers to the state court, federal review is "doubly deferential." *Id.*; *see also Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.").

*Cronic* created "a very limited exception to the application of *Strickland*'s two-part test," whereby prejudice is presumed "in situations that 'are so likely to

prejudice the accused that the cost of litigating their effect in the particular case is unjustified.'" *Haynes v. Cain*, 298 F.3d 375, 380 (5th Cir. 2002) (en banc) (quoting *Cronic*, 466 U.S. at 658). The Supreme Court identified three such situations: (1) where the accused is denied the presence of counsel at "a critical stage"; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (2) where counsel is called upon to render assistance under circumstances where competent counsel very likely could not. *Cronic*, 466 U.S. at 659–662.

As the state courts concluded, Tyson's case "does not fall within the narrow spectrum of cases described in *Cronic*." *Tyson*, 321 So.3d at 1153. Even inadequate or ineffectual actions by counsel does not amount to the complete denial of counsel required under *Cronic*. *See Russell v. Denmark*, 68 F.4th 252, 271 (5th Cir. 2023), *cert. denied*, 144 S.Ct. 576 (2024). Therefore, the state court's application of *Cronic* was neither contrary to nor an unreasonable application of federal law. Regardless, Tyson need not rely on a presumption of prejudice, as discussed below.

To demonstrate deficient performance under *Strickland*, Tyson "must show that [counsel] made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." *Hughes*, 7 F.4th at 387 (quoting *Anaya*, 976 F.3d at 551) (internal quotation marks and citation omitted)). Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Under the AEDPA's standard, federal

15

courts must defer to the state court unless no fair-minded jurist could conclude that a petitioner's trial counsel was reasonably competent.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Hughes*, 7 F.4th at 387 (quoting *Strickland*, 466 U.S. at 691) (internal quotations omitted). Counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). Counsel's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Hughes*, 7 F.4th at 387.

The American Bar Association standards—which the Supreme Court uses as a guide for determining what is reasonable—provide that "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case." *Hughes,* 7 F.4th at 388. Of course, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up," but it does require counsel to "have good reason to think further investigation would be a waste." *Id.* Accordingly, "trial counsel must not ignore 'pertinent avenues of investigation,' or even a single, particularly promising investigation lead." *Id.* (citations omitted).

Additionally, "counsel must . . . ensure that guilty pleas are entered only as an informed and voluntary choice, by actually and substantially assisting the defendant in deciding whether to plead guilty." *Diaz v. Martin*, 718 F.2d 1372, 1378

(5th Cir. 1983) (citations omitted).  It is essential that counsel be familiar with the facts and the law, including potential defenses, so that he can fully advise the defendant of options available to him.  *Id.*

Mr. Fish requested a sanity commission review because he thought Tyson may have a "mental disability."  ECF No. 8-1 at 845.  Dr. Seiden and Dr. Williams were appointed to conduct the examination.  ECF No. 8-1 at 146.  Tyson told Dr. Williams that "she first told the police that she had not shaken her baby, but 'when they kept interrogating me, I told them I had so they would stop.'"  ECF No. 1-3 at 309.  Tyson maintained her innocence throughout the interview with Dr. Williams.  She told him that her witnesses "can tell the truth" – she never shook Riley.  *Id.* at 311.

Likewise, Tyson told Dr. Seiden that she informed detectives that she did not shake Riley, but they repeatedly asked her about shaking her baby so she eventually told them yes "so they would stop."  ECF No. 1-3 at 315.  Tyson said that she was shocked when an officer told her the autopsy results had shown evidence of the baby being shaken.  *Id.*

The doctors' reports indicate that Tyson asserted her innocence, and Mr. Fish testified that he reviewed those reports before advising Tyson to plead guilty.  ECF No. 8-1 at 845.  Mr. Fish could not remember if Tyson maintained her innocence in her discussions with him.  But if nothing else did, Tyson's insistence of innocence to the examiners should have alerted Mr. Fish to the need to investigate further.

Additionally, Mr. Fish did not seek an autopsy review.  ECF No. 8-1 at 843. Mr. Fish testified that he failed to notice that Dr. Peretti performed an initial examination of the baby and embalmed her, but only rendered a cause of death of neck injuries after talking to law enforcement and performing a subsequent neck dissection.  ECF No. 8-1 at 844.  Had he noticed, it would have "set off a red flag." *Id.*  Moreover, Mr. Fish conceded that, at this juncture and with knowledge of the medical condition at issue, if this case would come across to his office now, he would probably seek a second opinion.  ECF No. 8-1 at 842-49.  When asked what he did to investigate, Mr. Fish acknowledged that he only reviewed discovery for a few hours. ECF No. 8-1 at 842.

To establish ineffective assistance due to a failure to investigate, a petitioner must also "allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."  *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998) (citation omitted).  A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate without adducing what the investigation would have shown.  *Diaz v. Quarterman*, 239 F. App'x 886, 890 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 696).  The petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed. *See Moawad*, 143 F.3d at 948; *see also Brown v. Dretke,* 419 F.3d 365, 375 (5th Cir. 2005); *Davis v. Cain*, No. 07–6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).

Tyson presented specific evidence of what an investigation into Riley's cause of death would have revealed, including:

- There was no evidence of any injury to the neck at C1; Riley's cervical spinal cord was intact; there was no fracture.  ECF No. 8-1 at 457.

- There was no brain herniation, bruising, or hemorrhage to support Tyson's description to the police as to how she shook Riley.  ECF No. 8-1 at 460.

- The autopsy, slides, and photographs did not support a finding of edema in the brain.  There was no brain injury.  ECF No. 8-1 at 484.

- Dr. Dragovic saw no evidence of hemorrhage of the ligaments and soft tissue at C1 in the slides and photographs taken by Dr. Peretti.  ECF No. 8-1 at 457.

- Retinal hemorrhage could not be seen without an ophthalmologic tool, so the police officer's indication that he could see signs of being shaken in Riley's eyes was impossible.  ECF No. 8-1 at 484.

- It is "scientifically impossible for there to be no hemosiderin yet have positive iron stains in the same area as described in the cervical spine portion of the autopsy report."  ECF No. 8-1 at 668.

- Dr. Peretti found no injury on his initial autopsy; he only found evidence of injury after being told by detectives that the baby had been shaken and after embalming had occurred.  ECF No. 8-1 at 709.

Dr. Peretti ultimately opined that Riley died of "neck injuries."  ECF No. 8-1 at 645.  However, his internal examination "of the soft tissues of the neck, including strap muscles, thyroid gland, and large vessels, revealed no abnormalities or hemorrhage. The hyoid bone and larynx were intact.  The epiglottis, vocal cords, salivary glands and tonsils were unremarkable."  ECF No. 8-1 at 648.  Dr. Peretti only performed a posterior neck dissection after the police told him that the baby had been shaken.  *Id.*  Dr. Peretti then reported non-descript "injuries involving

ligaments of cervical spine at C1" and mild cerebral edema. ECF No. 1 at 645, 650. Dr. Peretti noted hemosiderin deposits, but then found there were no iron stains. As Dr. Dragovic's report notes, these findings are mutually exclusive and therefore arguably unreliable.  ECF No. 8-1 at 675.  Tyson has thus set forth in detail what further investigation into the cause of death would have revealed.

The state courts determined that, had the case gone to trial, there would have been an instance of "dueling experts" because "Dr. Dragovic and Dr. Peretti are board certified forensic pathologists."  *Tyson*, 321 So.3d at 1147.  However, Dr. Peretti was not board certified.  ECF No. 8-1 at 454; 708.  Three board-certified forensic pathologists found that there was no evidence that Riley died from shaking or neck injuries. The board certified pathologists also concluded that the cause of death was undetermined.  As such, to the extent there may have been a "duel," Tyson has established that experts with more particular qualifications may well have won.

The state court specifically found that: Fish's investigation was limited to a four or five hour review of the discovery provided by the state; Fish did not seek a second opinion on the alleged cause of death even though funding was available, or talk to a pathology expert to review Dr. Peretti's autopsy findings; and Fish should have been alerted to the need for further investigation based on findings in the autopsy report, including the fact that some findings were made after discussions with law enforcement.  *Tyson*, 321 So.3d at 1153.  Despite these findings, the court concluded that Tyson did not meet the first prong of *Strickland* because "the State

presented Fish with the offer for Tyson to plead guilty to a lesser offense without a recommended sentence"; and "Fish also discussed the possible sentence with the trial judge." *Id.* It then concluded that "[u]nder the circumstances, and considering the sentence Tyson faced if convicted, the representation by Fish, an experienced criminal defense lawyer, was not deficient in this matter." *Id.*

Mr. Fish did not conduct an adequate independent investigation of the facts and circumstances of the case despite the obvious "red flags." While the circumstances of this case are particularly challenging, and affording the state courts all due deference, this Court concludes that the state court's determination was an unreasonable application of *Strickland*.[4] Although "conscious and informed decision[s] on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel," Mr. Fish's failure to investigate was not due to trial strategy. *Hughes,* 7 F.4th at 388 (citations omitted). Instead, Mr. Fish failed to notice that the determination of a cause of death came only after discussion with law enforcement. And to his credit, Mr. Fish admits that the first page of the autopsy report should and would have "set off a red flag"–had he noticed. ECF No. 8-1 at 844.

"[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing [the defendant] to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to

---

[4]Neither Tyson nor the Court suggest that Mr. Fish is inexperienced or ineffective, generally. Further, these findings are limited to the specific facts presented in this case only.

change his recommendation as to the plea." *Hill v. Lockhart*, 474 U.S. 52 (1985); *United States v. Juarez*, 672 F.3d 381, 387-88 (5th Cir. 2012) (finding counsel's "failure to investigate [the facts or law necessary] was unreasonable," in part because counsel admitted that he would have advised his client differently regarding a guilty plea had he uncovered the relevant information). The state court concluded that "the new evidence would not have changed Fish's recommendation" so "Tyson failed to establish any prejudice as a result of Fish's failure to conduct a more thorough investigation." *Tyson* 321 So.3d at 1154. However, Mr. Fish testified that a second opinion "may have" changed his advice to Tyson. ECF No. 8-1 at 852.

Additionally, as noted above, Tyson was "shocked" when an officer told her the autopsy results had shown evidence of the baby being shaken. She maintained her innocence to the evaluating psychologists and to her attorney, and only told the officers "yes" "so they would stop." ECF No. 1-3 at 315. Accordingly, it was neither strategic nor justifiable to rely so exclusively, if not solely, upon Tyson's confession, in choosing not to investigate further and to counsel Tyson to plead guilty.

Dr. Peretti determined the cause of death was a neck injury only after speaking with law enforcement and a re-examination after his initial autopsy and embalming. Tyson did not have the benefit of the medical findings from Dr. Dragovic, Dr. Plunkett, or Dr. Bonnell in making her decision to plead guilty. There

is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.[5] *Strickland*, 466 U.S. at 694.

Under *Strickland*, an attorney's relevant strategic choices are reasonable only "after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Mr. Fish's advice to Tyson to plead guilty was fatally undermined by his failure to conduct a reasonable investigation. Tyson now maintains that, had Mr. Fish adequately reviewed the autopsy and consulted with other experts, Tyson could have plausibly argued that the baby did not die from neck injuries or being shaken, and therefore, there is a reasonable probability she would not have pleaded guilty. ECF No. 1-2 at 39.

Tyson has established that her attorney's performance was constitutionally deficient. Therefore, the state court's application of *Strickland* was objectively unreasonable. Under the circumstances of this case, the failure to further investigate falls below an objective standard of reasonableness, as did counsel's subsequent advice to Tyson to plead guilty. And Tyson has established that the results of the is proceeding would have been different absent this deficiency. Tyson is therefore entitled to relief under *Strickland.*

## III.   <u>Conclusion</u>

---

[5] Again, this opinion does not suggest that every attorney must consult an expert before advising a client to plead guilty in every circumstance, or that a failure to do so is always ineffective assistance of counsel.

Because Tyson has met her burden under § 2254(d) and *Strickland*, IT IS RECOMMENDED that her Petition (ECF No. 1) be GRANTED, and the case be remanded to the trial court for further proceedings.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

SIGNED on Monday, May 6, 2024.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE